IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 29, 2020

## STATE OF TENNESSEE v. JOHNNY JAMES PARRISH

**Appeal from the Criminal Court for Greene County**
**No. 15CR336    Alex E. Pearson, Judge**

_____

### No. E2019-00664-CCA-R3-CD

_____

The Defendant, Johnny James Parrish, was convicted by a Greene County Criminal Court Jury of two counts of aggravated assault, a Class C felony, for which he is serving an effective fifteen-year sentence as a Range III, persistent offender. *See* T.C.A. § 39-13-102(a)(1) (2014) (subsequently amended). On appeal, he contends that (1) the evidence is insufficient to support his convictions, (2) the State made an inadequate election of offenses, (3) the trial court erred in denying his motion for a mistrial based upon the victim's not having been sequestered before he testified, (4) the trial court abused its discretion in admitting evidence pursuant to Tennessee Rule of Evidence 404(b) regarding a prior bad act of the Defendant toward the victim, and (5) he is entitled to a new trial due to cumulative errors. We affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and TIMOTHY L. EASTER, JJ., joined.

C. Berkeley Bell, Greeneville, Tennessee, for the Appellant, Johnny James Parrish.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Dan E. Armstrong, District Attorney General; J. Chalmers Thompson, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The Defendant's convictions relate to an altercation at a Thanksgiving family gathering, during which he stabbed Darren Gill's leg. The Defendant claimed he acted in self-defense because he was being beaten by the victim and Joseph Lee.

At the trial, Greeneville Police Detective Eddie Short testified that he was dispatched to an apartment complex on November 28, 2014. He arrived at 2:26 p.m. He said Amanda Lee and Joseph Lee, who was her "other step-brother brother, half-brother," were outside. Detective Short said they told him that the Defendant, Ms. Lee's "other half-brother," had stabbed the victim before leaving the scene. Detective Gill said he saw blood spatter and a knife outside the apartment building. Detective Short said the victim was inside the apartment building, sitting on a staircase that led to apartments, bleeding, and with a belt strapped to his leg. Detective Short identified photographs taken at the scene, which were received as exhibits. He said a photograph of Mr. Lee showed "the mark where he had been punched in the chin." Detective Short said a photograph of the victim showed blood on his leg. Detective Short said he had not allowed the victim to remove the belt from the victim's leg because Detective Short did not know how much the victim's leg would bleed. Detective Short said he collected the Defendant's cell phone and the knife as evidence. Detective Short said the knife folded and a had a "thumb stud" that was used to flip out the 4-and-5/8″ blade. He said the thumb stud allowed the blade to be flipped out with on hand. He said the knife also had a "seatbelt notch" for cutting a car's seatbelt. He said the blade was open and had blood on the tip of the blade when collected as evidence. He said he talked to the people at the scene. Detective Short said the victim declined medical treatment because the victim wanted his mother to take care of him.

Detective Short testified that officers went to the Defendant's mother's house to try to locate the Defendant. Detective Short said that the officers were unable to locate the Defendant that day but that Detective Short obtained warrants and filed a report. Detective Short said the Defendant was not arrested for about three months. He later agreed that, after he obtained the warrants, the Defendant surrendered to the Greene County Sheriff's Department "a little time later."

Anna Lee, the Defendant's mother, testified that the Defendant lived with her in November 2014 and at the time of the trial. She recalled that on November 28, 2014, the Defendant had come home, laid down his truck keys, said he had to go, and left through the back door. She said police officers looking for the Defendant came to her house about thirty minutes later. She said she did not see the Defendant for about seventy-six days, during which time he did not call or write to her. She said that the Defendant eventually returned and stated that he had been in Arkansas with family members.

The Defendant's mother testified that she had not been at Amanda Lee's apartment on the date of the incident. When asked if the Defendant had been injured when he came home from Ms. Lee's apartment, she said she had been in the kitchen and

had not seen him clearly. She said she did not take him to a doctor. She said he had been home for "[a] minute or two."

The Defendant's mother testified that she had Thanksgiving dinner at her house in the late afternoon that day. She said "[the victim] and Amanda and the kids and my youngest son, Joe, his kids" attended. She said the victim apologized to her for what had happened and stated he "wasn't trying to push it." She did not know if her guests had been at the victim's mother's house earlier.

The Defendant's mother testified that she knew on the day of the altercation that the victim had been stabbed but did not recall who told her. She said Joseph Lee or Amanda Lee called her. She said that she asked Mr. Lee about his well-being and that he said he was okay.

Joseph Lee, the Defendant's younger brother, testified that Amanda Lee was his sister and that the victim was his former brother-in-law.

Mr. Lee testified that he was at Amanda Lee's apartment on November 28, 2014, along with several family members, including children, for a Thanksgiving meal. He recalled that the Defendant and the victim argued that day but did not recall the subject or details. When asked if the Defendant had been invited, Mr. Lee said he thought the Defendant came to bring cigarettes to Ms. Lee. Mr. Lee said that the argument escalated and that the Defendant punched the victim's face twice. Mr. Lee said the victim took a defensive posture but did not return the blow. Mr. Lee did not think the children were in the room. Mr. Lee said that the Defendant pulled out a knife with the blade open when the victim took a defensive posture and that Mr. Lee inserted himself between the men and told the Defendant he needed to leave. Mr. Lee said the Defendant was three feet from the victim when the Defendant displayed the knife. Mr. Lee said the Defendant left the apartment but forgot his car keys. Mr. Lee said that the Defendant yelled for the keys, that Mr. Lee opened the door, that the Defendant was still holding the knife, and that Mr. Lee took the knife from the Defendant and gave the Defendant the keys. Mr. Lee said that he told the Defendant to leave but that the Defendant continued to argue. Mr. Lee said he "got him out" of the apartment building and threw the knife. Mr. Lee said that he tried to throw the knife across the road but that it hit a railing and fell to the ground.

Mr. Lee testified that he repeatedly told the Defendant to leave. Mr. Lee said that the Defendant pushed him, that he pushed the Defendant, and that the Defendant punched him twice. Mr. Lee said he grabbed the Defendant and "wrestled him up to the car." Mr.

Lee said that the Defendant was not holding the knife. Mr. Lee said that he and the Defendant wrestled, that the victim came downstairs, that Mr. Lee repeatedly told the Defendant to leave, that the Defendant "broke free," and that the Defendant and the victim "started again." Mr. Lee said, "I guess [the Defendant] picked up the knife and stabbed him." Mr. Lee said that he was about six feet away when the victim was stabbed and that he grabbed the Defendant and took the knife. Mr. Lee said the Defendant "got up and left."

Mr. Lee testified that when he repeatedly told the Defendant to leave, the Defendant had been "working on it" but "was still kind of blah-blah as he walked off." Mr. Lee said he had pushed the Defendant against a car when the Defendant hit him in an attempt to prevent the Defendant from hitting him again.

Mr. Lee testified that he applied his belt to the victim's leg as a tourniquet. He identified photograph exhibits depicting the victim's leg and a mark on Mr. Lee's chin. Mr. Lee said that he might have also had a mark on his forehead but that he did not seek medical treatment. He said Ms. Lee's apartment door was damaged because the Defendant kicked it when he returned to get his keys.

Mr. Lee testified that the victim had a black belt in Taekwondo. Mr. Lee said he had seen the victim fight "with a guy that had beat on his little cousin." Mr. Lee said the victim had "not really" used his martial arts training in the fight and that the victim "just threw punches." Mr. Lee agreed that the victim was a "pretty good size fellow" and said the victim was 6′4″ and weighed 165 to 180 pounds. Mr. Lee said that the victim had not had a weapon during the confrontation with the Defendant and that the victim "had his dukes up."

Anthony Pratt testified that he was visiting at a friend's apartment around Thanksgiving 2014 when he heard a disturbance. He said he was standing by his truck outside and saw "two guys . . . fighting with another guy, the individual was on the ground and the other two guys [were] fighting with him, hitting, kicking and punching him." He said he went upstairs and called the police because he thought, "The man that was getting beat up . . . seemed in a bad situation." He said the man was on the gravel and was being hit and kicked by the other men. He said he did not know anyone's identity. He said a woman in a wheelchair sat on the balcony in front of the apartment building and encouraged the men who were beating and kicking the man on the ground. Mr. Pratt agreed that the woman said to "beat the hell out of him." Mr. Pratt said he had not been close enough to have seen a knife in one of the men's hands.

-4-

Amanda Lee, the Defendant's half-sister, testified that Mr. Lee was also her brother and that the victim was the father of her two children. She said that on November 28, 2014, the victim, Mr. Lee, the Defendant, her two sons, her niece and nephew, and two additional children of the victim's were at her apartment. She said they were preparing to go to the victim's mother's house for Thanksgiving dinner. She said it was the day after Thanksgiving. She said the Defendant was not invited to the Thanksgiving dinner with them. She said she was not expecting the Defendant to come to her apartment that day.

Amanda Lee testified that the Defendant arrived and that the mood was friendly at first. She said an issue arose between the victim and the Defendant about a car battery and that the Defendant began yelling and screaming at the victim. She did not recall if she and the victim had been bickering or what the subject might have been but said she was unconcerned for anyone's safety. She said that the victim might have raised his voice but that he was a "mild person." She denied that she told the victim to leave and denied that the Defendant came to make sure the victim left. She said the victim was not in her face and noted that the victim was 6′4″ and that she was in a wheelchair.

Amanda Lee testified that the situation escalated quickly and that the Defendant hit the victim's face twice. She said the victim stepped back toward the kitchen and said he did not want to fight in front of his children and was not going to be provoked to violence. She said the Defendant responded by pulling a knife on the victim. She said that the blade was out and that the Defendant "was kind of going toward" the victim with it. She said the Defendant was in her living room, almost into her kitchen. She said Mr. Lee intervened, inserted himself between the Defendant and the victim, and pushed the Defendant out the apartment door. She said the victim had not done anything to the Defendant at this point, other than to back up and insist he did not want to fight.

Amanda Lee testified that the Defendant tried to kick in her front door. She said he had lost or dropped his keys inside the apartment. She said she screamed at him to leave and screamed at Mr. Lee to get the Defendant's keys for him. She said Mr. Lee opened her door to toss out the Defendant's keys, that the Defendant held the knife and tried to get inside, and that Mr. Lee pushed the Defendant out her apartment door and outside the entryway door. She said she called the police. She said she went outside but took a "few moments" to get there because she had been on the phone with the police, had only been in a wheelchair for eight months, and had been learning to maneuver. She said the Defendant damaged her apartment door when he tried to kick it down and identified cracked wood on the door depicted in an exhibit. She said the victim went outside "right after" Mr. Lee.

Amanda Lee testified that before she went outside, she was concerned the Defendant would stab the victim. She said that when she went outside, the Defendant moved toward the victim and that Mr. Lee attempted to grab the Defendant to stop him. She said that the victim stepped back, away from the Defendant, and that the Defendant stabbed the victim. She thought the victim was stabbed on the inside of his leg because he was stepping back with the opposite leg. She said the Defendant was swinging the knife "out wide" and that Mr. Lee was trying to restrain the Defendant. She said the victim yelled that he had been stabbed, grabbed his leg, and limped into the apartment building.

Amanda Lee testified that during the altercation outside, Mr. Lee was trying to stop the Defendant, and the victim was backing away from the Defendant. She said Mr. Lee and the victim grappled and noted that they were brothers who "feel comfortable trying to snatch your brother up." She did not recall what she said during the altercation but recalled she had been upset with the Defendant. She said she wanted him to leave her apartment, put away the knife, and refrain from violence. She said she "hoped" the victim "could beat him up." She denied that she wanted the victim to kick the Defendant's head and denied that she yelled for the victim to "beat the hell out of him." When shown her prior signed statement, which stated she had hoped the victim would kick the Defendant's head, she acknowledged her signature but denied she had "ever said those words" during the confrontation. She acknowledged that she yelled to the victim that the Defendant had just stabbed him and that the victim should "kick[ the Defendant's] butt." She said that the victim had not been the aggressor and that the Defendant had no trouble getting into his truck and leaving after stabbing the victim.

Amanda Lee testified that she picked up the Defendant's phone "not to be ugly but just to help my brother out and not let his phone be confiscated." She said that she did not see him often, that she had recently been paralyzed and in the hospital, and that he had not visited her at the hospital or recovery center.

Amanda Lee testified that she had assumed the Defendant went to Oklahoma after the stabbing because they were from Oklahoma and had family there. She said the Defendant received disability benefits for "mental issues."

Amanda Lee testified that the victim had medals from his martial arts training or kickboxing and agreed that he was "accomplished." She said the victim received the medals when he was about age fifteen and that he was now forty. When asked if she saw the victim use his martial arts skills during the altercation with the Defendant, she said

she did not see the victim "kick his legs." She said the victim did not have a weapon during the incident, aside from when he picked up the Defendant's knife to throw it. She said that she never saw the victim be aggressive toward the Defendant and that the victim tried to back away and defuse the situation.

Amanda Lee testified that she had been at "Lisa's"[1] sometime later that day for Thanksgiving dinner. She said Lisa was a registered nurse and had bandaged the victim's wound.

B.L., a sixth grader and the son of Amanda Lee and the victim, testified that, on the day of the incident, the Defendant and the victim had been conversing casually in his living room. He said they started arguing, which turned to a fight. B.L. said that he left the room but that when he returned to see if the fight had ended, the Defendant was outside saying he had forgotten his keys. B.L. said Mr. Lee opened the door to give the Defendant the keys. B.L. said that he was unsure how the Defendant got inside the apartment again and that "they" fought outside for a while. B.L. said he saw the victim get stabbed. He said that the other children screamed a lot, that the Defendant left, and that EMTs attended the victim in the foyer. B.L. said he had not seen the knife inside the apartment.

Greeneville Police Captain Tim Hartman testified that, on the day of the incident, he went to to the Defendant's mother's house and spoke with her. Captain Hartman said the Defendant was not home. He said he returned several times over a period of weeks and months but was never able to locate the Defendant. He said the Defendant's mother became irritated, thought the police were harassing her, and told them she did not know where the Defendant was located.

The victim testified that he had been living in Pennsylvania temporarily for work in November 2014 and that he came home for Thanksgiving. He said that he had been at Ms. Lee's apartment for less than an hour, that they were getting ready to go to the victim's mother's house, and that the Defendant arrived unexpectedly. The victim said the Defendant was not going to the victim's mother's house for Thanksgiving dinner. The victim said he had no established plans to see the Defendant that day but that he thought he would because of a disagreement over money for a battery. The victim said he had allowed the Defendant to drive the victim's van while the victim was out of town, that the battery had died, and that the Defendant installed a battery he had taken from

---

[1] Other evidence established "Lisa" was Lisa Parchinski, the victim's mother.

another car.  The victim said that he eventually retrieved the van and that the Defendant wanted the battery returned to him.   The victim said he did not think the victim should receive the battery but offered to pay half the cost of a battery "just to be nice about it" but did not give the money to the Defendant at the time because he did not have it.  The victim said that he took the van to Pennsylvania and that every time he spoke to Ms. Lee, she told him the Defendant had asked about the money.  The victim said he did not think he actually owed the Defendant any money but that he told Ms. Lee he would pay the Defendant when the victim came to Tennessee for Thanksgiving.

The victim testified that when the Defendant appeared at Ms. Lee's apartment, he said something about the money.  The victim said he told the Defendant, "I don't really feel like I owe you the money but fine, I'll give you the forty dollars.  My wallet is out in the car . . . let me get the kids together so we can head out and when we head out that way I'll give you the money."  The victim said the Defendant seemed agitated and "on edge" but that the Defendant did not respond.

The victim testified that while he had a "parental discussion" with Ms. Lee while standing about three feet in front of her, the Defendant came from behind him and hit him twice on his left side.  The victim denied that he and Ms. Lee argued.  The victim said that after the Defendant hit him, he staggered to the side, turned around, and told the Defendant, "I am not doing this in front of my kids."  The victim said the Defendant responded, "[W]ell, fine, bring your 'A' outside."  The victim said the Defendant turned and left the apartment.  The victim said that he turned and followed the Defendant as if he were going to follow the Defendant outside but that when the Defendant went out of the foyer door, the victim locked the deadbolt on the apartment door.

The victim testified that the Defendant began kicking the apartment door and saying his keys were inside.  The victim said Mr. Lee retrieved the Defendant's keys and opened the door.  The victim said the Defendant entered the apartment with such force that Mr. Lee fell over to the loveseat.  The victim said the Defendant held an open knife.  The victim said he raised his hands and backed thirty feet through the living room and dining room while the Defendant walked toward him holding up the knife in one hand.  The victim said he feared for his safety.  The victim said Mr. Lee came from behind the Defendant, took the knife, threw it, and pulled the Defendant out the apartment door.  The victim said six children had been in the living room when the Defendant came toward him with the knife.

The victim testified that after Mr. Lee pulled the Defendant out of the apartment, the Defendant got away from the victim and came to the apartment door again.  The

-8-

victim said he raised his hands to defend himself because he thought the Defendant was going to "come at" him again. The victim said he did not have a weapon and had not picked up anything. The victim said Mr. Lee grabbed the Defendant from behind and took him outside the apartment building. The victim said that when he went outside, the Defendant and Mr. Lee were scuffling and "almost wrestling." The victim said that he looked outside and saw that Mr. Lee held the Defendant's arm and that the Defendant hit Mr. Lee's face. The victim said he and Ms. Lee called 9-1-1.

The victim testified that he ran to help Mr. Lee restrain the Defendant until the police arrived. The victim said he had not realized the Defendant had the knife. The victim said that the Defendant weighed over 200 pounds at the time and that the victim hit the Defendant in the stomach "trying to fold him over, get him to the ground." The victim said the blow knocked the Defendant into some bushes. The victim said the Defendant tripped or was pushed from behind by Mr. Lee and ended up on all fours in front of the victim. The victim said that he hit the Defendant's head twice and that the Defendant stabbed him. The victim thought he hit the Defendant's forehead. The victim said he had not seen the knife until the stabbing occurred. The victim denied that he and Mr. Lee had the Defendant "up on the car hitting him." The victim said the Defendant had been fighting Mr. Lee in an effort to get away from Mr. Lee and to get to the victim. The victim indicated to the jury the area where he was stabbed. He said the stab "made a thud, all the way in." He said that he took two steps back and that the Defendant came toward him. The victim said that he hit the Defendant twice and that when the victim removed his hands from his leg, blood gushed out. The victim said he feared he was "bleeding out" and ran toward Ms. Lee's wheelchair ramp. The victim said the Defendant ran to his mother's truck. The victim said Mr. Lee applied a belt as a tourniquet to the victim's bleeding leg. The victim identified photographs of his wound and blood on the steps. The victim said he did not have a weapon at any point.

The victim said he was involved in kickboxing when he was age fifteen and that he was now forty-one. He said the sport was taught as a self-defense skill, not as a way to be aggressive. He said he had used his kickboxing skills defensively two or three times "on the streets" but had never caused anyone permanent injuries. He said he had been attacked on those occasions. The victim said he had not tried to injure the Defendant but had tried to incapacitate the Defendant until the police arrived. The victim said the Defendant moved toward him repeatedly after Mr. Lee released the Defendant from restraint. The victim denied that he kicked the Defendant or that anyone encouraged him to kick the Defendant. The victim said Ms. Lee commented after the victim had been stabbed that she would "kick his butt even more." The victim said he feared the Defendant with the knife outside.

The victim testified that emergency medical personnel bandaged his leg at the scene but that he declined medical treatment for his stab wound because he had driven 700 miles to see his family and did not want to spend the day at the hospital while his family celebrated Thanksgiving and because he did not have medical insurance. He said that his mother was in her last semester of registered nursing school and that he would have her treat him, which she did later that day. The victim said she "did a band-aid type of stitch where they don't actually stitch you, it's pulled together and bandaged it." He said he never saw a doctor. The victim said that since the stabbing, his hamstring was tight every morning. He said that in the weeks after the stabbing, he was bruised from his Achilles tendon to his groin and that it hurt. He said that he continued to have tightness if he bent over with his leg straight and that stretching his hamstring was difficult. He said that he did construction work and that the residual pain from the injury occurred every time he used his hamstring. He said the scar left from the stab wound was "about an inch or so wide" and that the knife had gone "all the way into the muscle." He said he felt more pain on the side of his leg where the tip of the blade had been than at the cut.

The victim testified that he and the Defendant had a prior altercation shortly after the victim and Ms. Lee ended their relationship. The victim said that after he and Ms. Lee had argued, the Defendant and Mr. Lee came to the victim's workplace "to beat [him] up." The victim said the Defendant got out of a truck holding a three-wood golf club and said they needed to go across the street for a talk. The victim said that in the process of their conversation, the Defendant saw that the victim was not scared and put down the golf club.

The victim testified that Mr. Pratt's testimony had not been truthful when Mr. Pratt claimed to have seen the victim and Mr. Lee beating the Defendant on the ground so badly that Mr. Pratt felt compelled to call the police.

The victim denied that he had gone to the Defendant's mother's house in December and January of unspecified years and had tried to get the Defendant to come outside and fight in the street.

Lisa Parchinski, the victim's mother, testified that she had been a registered nurse for three years. She said that after the victim had been stabbed, she cleaned and bandaged his wound. She said the cut was about three inches deep. She said he needed stitches but declined to go to the hospital. She said that the wound had been in the femoral artery area and that if the femoral artery had been cut, the injury could have been fatal. She agreed the victim had been able to have Thanksgiving dinner.

-10-

Detective Eddie Short was recalled and testified that the victim never indicated he did not want to pursue the charges against the Defendant.

Dennis Coffey testified for the defense that in November 2014, he lived in the apartment complex where the incident in this case occurred. He said he performed maintenance duties at the complex and, on occasion, was the acting manager when the manager was out of town. He said he knew the Defendant because the Defendant's mother and Mr. Coffey's wife worked together. He also knew Ms. Lee.

Mr. Coffey identified his bedroom window on a photograph exhibit depicting the apartment complex. He said he had heard yelling and had seen an altercation out his window involving "two men fighting against one." He said one of the men pinned another man against a car, that the two men hit each other, and that the man pinned against the car stabbed the other man's leg. Mr. Coffey said he did not see the knife or stabbing but saw the gesture and saw one of the men move back. He said he "figured something happened." He said he later learned that the Defendant had been the man who had been pinned against the car. Mr. Coffey said that when the Defendant stabbed the man, the man, who had been "on top of" the Defendant, released the Defendant, who then ran away. Mr. Coffey said he did not see kicking. He said that most of the altercation was between the two men who were at the car and that the third man ran up at times. Mr. Coffey said the stabbing occurred when the Defendant was up against the car, not on the ground.

Mr. Coffey testified that he saw the blood from the victim's injuries and that he was involved in cleaning it. He thought he probably repaired Ms. Lee's damaged door. He said he saw the victim's bandaged leg and agreed the injury appeared serious.

Mr. Coffey acknowledged his prior conviction for aggravated burglary involving his entry into a home and his stabbing an occupant. He also acknowledged a federal conviction for bank robbery.

After receiving the proof, the jury convicted the Defendant of the charged offenses, two counts of aggravated assault. The trial court sentenced the Defendant, a Range III, persistent offender, to concurrent fifteen-year sentences. This appeal followed.

**I & II**

-11-

**Sufficiency of the Evidence & Election of Offenses**

The Defendant contends that the evidence is insufficient to support his convictions. In a related issue, he contends that the State made an inadequate election of offenses relative to Count 1. The State counters that the evidence is sufficient to support the convictions and that its election was adequate to ensure juror unanimity. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value . . . given to the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)*; see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn 2009)).

As relevant to this appeal,

(a)(1) A person commits aggravated assault who:

(A) Intentionally or knowingly commits an assault as defined in § 39-13-101, and the assault:

    (i)    Results in serious bodily injury to another; [or]

    . . .

    (iii)  Involved the use or display of a deadly weapon[.]

-12-

T.C.A. § 39-13-102(a)(1)(A)(i), (iii) (2014) (subsequently amended).

> (a) person commits assault who:
>
> (1) Intentionally, knowingly or recklessly causes bodily injury to another; [or]
>
> (2) Intentionally or knowingly causes another to reasonably fear imminent bodily injury[.]

*Id.* § 39-13-101 (2014) (subsequently amended).

"'Bodily injury' includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." *Id.* § 39-11-106(a)(2) (2014) (subsequently amended). "'Serious bodily injury' means bodily injury that involves: (A) A substantial risk of death; (B) Protracted unconsciousness; (C) Extreme physical pain; (D) Protracted or obvious disfigurement; [or] (E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty[.]" *Id.* § 39-11-106(a)(34).

When evidence is presented of multiple offenses that would fit the allegations of the charge, the State must elect the particular offense for which a conviction is sought, and the trial court must instruct the jury as to the need for jury unanimity regarding the finding of the particular offense elected. *See, e.g., State v. Brown*, 762 S.W.2d 135, 137 (Tenn. 1988); *State v. Walton*, 958 S.W.2d 724, 727 (Tenn. 1997). "The purpose of election is to ensure that each juror is considering the same occurrence. If the prosecution cannot identify an event for which to ask a conviction, then the court cannot be assured of a unanimous decision." *State v. Shelton*, 851 S.W.2d 134, 138 (Tenn. 1993).

> This election requirement . . . ensures that a defendant is able to prepare for and make a defense for a specific charge. Second, election protects a defendant against double jeopardy by prohibiting retrial on the same specific charge. Third, it enables the trial court and the appellate courts to review the legal sufficiency of the evidence. The most important reason for the election requirement, however, is that it ensures that the jurors deliberate over and render a verdict on the same offense.

*State v. Adams*, 24 S.W.3d 289, 294 (Tenn. 2000). The critical reason, however, for the election is to protect a defendant against "patchwork verdicts." *Shelton*, 851 S.W.2d at 137.

> Relative to an election of offenses,
>
> > [T]he standard for sufficiency of the evidence applies to the designation of offenses as though it were an element of the offenses. Not only must the state's election identify and distinguish offenses sufficiently to allow the trier of fact to render discrete and unanimous verdicts on each, the state must . . . support this election with evidence sufficient for a reasonable trier of fact to find that the offenses occurred as elected beyond a reasonable doubt.

*State v. Johnny Lee Hines*, No. 01C01-9709-CC-00405, 1999 WL 33107, at \*4 (Tenn. Crim. App. Jan. 27, 1999).

The jury instructions have been omitted from the appellate record. As such, we do not know how the jury was instructed relative to the election. *See* T.R.A.P. 24(b) (charging the appellant with the duty to ensure that a transcript is prepared which conveys a fair, accurate, and complete account of what transpired in the trial court as related to the issues raised on appeal). The record reflects that the trial court stated its intent relative to the jury instructions as follows:

> The way the indictment is drafted at this point in time, . . . there could be a little bit of concern. So in the form of an election, in order to ensure that we have a unanimous verdict, the Court is going to modify the verdict form that I have to make sure that it's clear that the aggravated assault that the jury will be voting on in Count 1 is the incident that occurred inside the house and that the incident of the stabbing is the incident that occurred outside because I do think the way that it is, if I don't make that distinction on the verdict form, somebody could be confused about whether or not something was happening outside, whether something was happening inside. But I think so long as the verdict form reflects that they understood that Count 1, and I'll modify that before we get it to the jury and I will let you all look at it to make sure that you feel that it adequately does that, that establishes clearly that the knife being displayed in the house is Count 1 and that's all they can consider for it. Then Count 2 will be whether or not there was a serious bodily injury for the incident that occurred outside the house.

At the motion for a new trial, the court stated that it had instructed the jury as follows:

The jury is only to consider the evidence of what occurred inside the apartment itself in determining guilt or innocence on Count 1 or its lesser included offense.

. . . .

The jury is only to consider the evidence that occurred outside the apartment in determining the guilt or innocence in Count 2 or its lesser included offense.

The Defendant does not contend that the trial court's instructions varied from its statement of intent with regard to the instructions and its recitation of the instructions at the motion for a new trial. We will consider the issue based upon the record before us.

In that regard, the Defendant argues that the election relative to Count 1 was inadequate because the State's witnesses described multiple incidents occurring inside the apartment. The Defendant notes that Mr. Lee and Ms. Lee testified about two events inside the apartment building: first, that during the Defendant's initial entry into the apartment, he displayed a knife and moved toward the victim before Mr. Lee pushed the Defendant out of the apartment, and second, after Mr. Lee had removed the Defendant from the apartment, the Defendant battered the door until Mr. Lee opened to find the Defendant standing there with a knife, whereupon Mr. Lee took the knife from the Defendant without the Defendant ever reentering the apartment. The Defendant argues that the victim's testimony regarding an assault inside the apartment contradicted that of Mr. Lee and Ms. Lee, in that the Defendant testified that the victim did not threaten him with a knife during the Defendant's initial entry into the apartment and that the Defendant reentered the apartment after battering the door and came toward the victim with a knife as the victim backed through the apartment.

The State argues that, notwithstanding the inconsistencies in the evidence regarding the precise timing of the incident inside Ms. Lee's apartment, all of the witnesses were consistent in describing a single incident with a knife inside the apartment and that no evidence suggested the Defendant threatened the victim multiple times while inside the apartment.

We agree with the State that the evidence showed a single incident in which the Defendant threatened the victim with a knife inside the apartment. The eyewitness accounts varied about the point at which the incident occurred, but all were consistent about the fact of the occurrence of the event. The critical question before the jury was whether to believe the State's witnesses regarding the occurrence of the event. The timing of the singular event was not an element of the offense that the jury was called

-15-

upon to resolve in determining whether a crime occurred. We conclude that the State's election was adequate to inform the defense of the charge against which it must defend, to protect the Defendant against double jeopardy, to allow the jurors to deliberate over and render a verdict as to the same offense, and to enable legal review of the sufficiency of the evidence. *See Adams*, 24 S.W.3d at 294; *see also Shelton*, 851 S.W.2d at 137.

Turning to the question of the sufficiency of the evidence in Count 1, the evidence viewed in the light most favorable to the State shows that the Defendant brandished a knife and walked toward the victim inside Ms. Lee's apartment. The victim walked backward, and the Defendant continued to advance toward the victim. The victim reasonably feared imminent bodily injury as a result of the Defendant's conduct. The evidence that the Defendant continued to advance as the victim backed away supports a conclusion that the Defendant's conduct was intentional. Although the Defendant argues that the witnesses' testimony was inconsistent in some respects, our review is of the evidence in the light most favorable to the State, and, in that regard, all witnesses testified that the Defendant brandished a knife and advanced toward the victim as he retreated. The evidence is sufficient to support the conviction in Count 1.

With regard to Count 2, the indictment charged the Defendant with "knowingly causing serious bodily injury to [the victim] by stabbing him in his thigh with a knife." The Defendant does not contest that he stabbed the victim but argues that the State failed to prove that the victim suffered serious bodily injury. He points to the lack of medical testimony and argues that he acted in self-defense. The State responds that the evidence showed that the victim was left with a scar and that the evidence does not support a self-defense theory.

We begin by observing that the allegations of Count 2 of the indictment fit two modes of aggravated assault: (1) assault resulting in serious bodily injury and (2) assault resulting in bodily injury and involving the use or display of a deadly weapon. *See* T.C.A. § 39-13-102(a)(1)(A)(i), (iii). As we have stated, the jury instructions have been omitted from the appellate record. As such, we do not know how the jury was instructed relative to Count 2. See T.R.A.P. 24(b). We will consider both alternatives.

The record reflects that the victim suffered bodily injury and that the Defendant used a knife, which is a deadly weapon, to inflict the injury. *See* T.C.A. § 39-11-106(a)(6) (stating that "[a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury" is a deadly weapon). Thus, the evidence is sufficient to support a conviction of aggravated assault pursuant to Code section 39-13-102(a)(1)(A)(iii).

The parties in this case have focused their arguments on the other alternative, aggravated assault involving serious bodily injury. Whether a person has suffered serious

bodily injury, as opposed to bodily injury, is one of fact for the jury's determination, rather than a question of law for the court. *State v. Barnes*, 954 S.W.2d 760, 765-66 (Tenn. Crim. App. 1997). Viewed in the light most favorable to the State, the evidence in the present case shows that the Defendant stabbed the victim during an altercation in which the Defendant was the aggressor, that the victim bled profusely, and that he was left with a one-inch scar and residual mobility issues. The victim's mother, who had nursing training and was a registered nurse at the time of the trial, testified that the victim needed stiches for a wound that was about three inches deep, although the evidence showed that the victim declined to go to the hospital because he did not have medical insurance and that he wanted his mother to tend his wound instead. The victim testified that the knife deeply penetrated his leg and that he had pain from the injury every time he used his hamstring in his employment as a construction worker. This court has said that the existence of a scar is sufficient to support a finding of "protracted or obvious disfigurement" and, therefore, serious bodily injury. *See, e.g.*, *State v. Charles Eugene Darvin, Jr.*, No. M2018-01669-CCA-R3-CD, 2019 WL 4440220, at *4 (Tenn. Crim. App. Sept. 17, 2019), *perm. app. denied* (Tenn. Jan. 15, 2020); *State v. Deonte Matthews*, No. M2010-00647-CCA-R3-CD, 2012 WL 5378046, at *4 (Tenn. Crim. App. Oct. 31, 2012). We conclude that the evidence is sufficient to support the serious bodily injury element of the offense of aggravated assault.

In so holding, we have not overlooked our supreme court's decision in *State v. Farmer*, 380 S.W.3d 96 (Tenn. 2012), in which the court held that a penetrating gunshot wound did not constitute serious bodily injury. In *Farmer*, the evidence showed that the victim suffered "mild to moderate" pain, and his testimony did not show that he suffered protracted or obvious disfigurement, protracted loss or substantial impairment, or disfigurement. *See id.* at 102. The victim in *Farmer* testified that he had no residual problems with his leg. *Id.* Based upon the evidence, the supreme court held that no evidence supported a finding that the victim had been subject to a substantial risk of death. *Id.* In contrast, the evidence in the present case shows that the victim had a deep, penetrating wound, bled profusely, had a one-inch scar, and was left with mobility issues. The evidence, viewed in the light most favorable to the State, supports a conclusion that the victim suffered serious bodily injury for the reasons we have stated previously.

In so holding, we have considered but rejected the Defendant's claim that the evidence is insufficient because the Defendant acted in self-defense relative Count 2. As pertinent to this case, the self-defense statute provides:

> (b)(1) Notwithstanding § 39-17-1322 [relative to the use of a handgun in self-defense or defense of another], a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when and to the degree the person reasonably believes the force is

immediately necessary to protect against the other's use or attempted use of unlawful force.

(2) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

> (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;
>
> (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and
>
> (C) The belief of danger is founded upon reasonable grounds.

T.C.A. § 39-11-611(b)(1), (2)(A)-(C) (2014) (subsequently amended). Once a defendant has raised sufficient facts to support a finding he acted in defense of self, "The state has the burden of proof to negate the defense; the burden is not upon the defendant to prove the defense exists." *State v. Belser*, 945 S.W.2d 776, 782 (Tenn. Crim. App. 1996) (citing T.C.A. § 39-11-201(a)(3)).

In that regard, Mr. Pratt and Mr. Coffey testified that they witnessed a two-against-one situation in which the Defendant was the target of an assault by two other men. However, multiple State's witnesses testified that the Defendant was the armed aggressor in the confrontation outside the apartment building. The resolution of which scenario accurately reflected the events that actually transpired was a question of fact for the jury, which rejected the Defendant's self-defense theory. A rational jury could find, based upon the evidence presented, that the Defendant intended to harm the victim with a knife, that he retrieved the knife after Mr. Lee took it from him, that the Defendant continued to act aggressively toward the victim even after being evicted from Ms. Lee's apartment, that the Defendant fought with the victim rather than leaving, and that the Defendant stabbed the unarmed victim with a knife as the victim attempted to retreat. Thus, the State presented adequate evidence from which the jury could find that the State had negated the Defendant's self-defense theory.

The Defendant is not entitled to relief on this basis.

**III**

-18-

## Denial of Motion for a Mistrial

The Defendant contends that the trial court abused its discretion in denying his motion for a mistrial based upon the victim's not having been sequestered pursuant to Tennessee Rule of Evidence 615. The Defendant argues that he was denied his rights to due process and a fair trial and that the court should have required the State to call the victim as its first witness. The State responds that the court properly denied the motion for a mistrial because the victim's presence in the courtroom was authorized by Tennessee Constitution Article I, Section 35 and Article XI, Section 16. We conclude that the Defendant is not entitled to relief.

A trial judge should declare a mistrial if manifest necessity arises. *Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). Manifest necessity occurs when "no feasible alternative to halting the proceedings" exists. *State v. Knight*, 616 S.W.2d 593, 596 (Tenn. 1981). "The granting or denial of a mistrial is within the sound discretion of the trial court." *State v. McKinney*, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996); *see State v. Jones*, 802 S.W.2d 221, 222 (Tenn. Crim. App. 1990). This court will only disturb that decision if the trial court abused its discretion. *State v. Adkins*, 786 S.W.2d 642, 644 (Tenn. 1990).

Tennessee Rule of Evidence 615 provides:

At the request of a party the court shall order witnesses, including rebuttal witnesses, excluded at trial or other adjudicatory hearing. In the court's discretion, the requested sequestration may be effective before voir dire, but in any event shall be effective before opening statements. The court shall order all persons not to disclose by any means to excluded witnesses any live trial testimony or exhibits created in the courtroom by a witness. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) a person designated by counsel for a party that is not a natural person, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause. This rule does not forbid testimony of a witness called at the rebuttal stage of a hearing if, in the court's discretion, counsel is genuinely surprised and demonstrates a need for rebuttal testimony from an unsequestered witness.

As pertinent to this appeal, the Tennessee Constitution provides:

To preserve and protect the rights of victims of crime to justice and due process, victims shall be entitled to the following basic rights:

. . . .

-19-

> 3. The right to be present at all proceedings where the defendant has the right to be present.

Tenn. Const. Art. 1, § 35.

The record reflects that the witnesses were excluded from the courtroom pursuant to Rule 615 after they were sworn at the beginning of the trial. After Detective Short and the Defendant's mother testified, the trial court conducted a jury-out hearing regarding the victim's presence in the courtroom during the testimony. The court noted that defense counsel had objected previously, citing Rule 615, and that the State asserted the victim's constitutional right to be present. The defense's objection and the State's response were not made on the record that has been provided to this court; however, the parties do not dispute the court's account.

At the jury-out hearing, defense counsel moved for a mistrial on the basis of a Rule 615 violation, and the State again asserted the victim's constitutional right to be present. The trial court ruled that the state constitutional provision "trumps Rule 615" and denied the motion. Thereafter, the State called five additional witnesses before it called the victim to testify.

The Defendant raised the denial of the motion for a mistrial in his motion for a new trial. At the motion for a new trial, he alleged, in addition to a violation of Rule 615, that his constitutional right to a fair trial had been violated. Defense counsel argued at the motion for a new trial hearing that the victim had heard the testimony of seven witnesses before testifying and that he corrected or clarified matters in his testimony to address the previous testimony and stated that Ms. Lee, who testified before him, had given false testimony.

On appeal, the Defendant argues for an extension of the law to hold that he has a fundamental constitutional right to the protections of Rule 615. He argues that the State should have been required to call the victim as its first witness in order to comport with his rights to due process and a fair trial and that prejudice must be presumed from the infringement of these rights.

First, as an intermediate appellate court, it is our duty to apply existing law. *See State v. Pendergrass*, 13 S.W.3d 389, 397 (Tenn. Crim. App. 1999); *State v. Wilson J.B. Jones*, No. W2016-01550-CCA-R3-CD, 2017 WL 2820173, at *1 (Tenn. Crim. App. June 29, 2017). Any extension of heretofore unrecognized fundamental constitutional right to sequestration of witnesses is the province of our supreme court and the United States Supreme Court. We will, therefore, apply existing law to the Defendant's claim.

The record reflects that the defense brought the victim's presence in the courtroom to the court's attention after the provisions of Rule 615 had been invoked. Rule 615 permits the State, in a criminal prosecution, to designate a crime victim as its representative who is permitted to remain in the courtroom. *See* Tenn. R. Evid. 615, *Advisory Comm'n Cmt. to 1997 Amendment*. The record in the present case does not reflect that the State explicitly designated the victim as its representative. However, this court has said that when the State argued at a motion in limine regarding Rule 615 that crime victims should not be excluded from the courtroom, such is tantamount to a designation of the victims as the State's representatives. *State v. Lance Sandifer*, No. M2008-02849-CCA-R3-CD, 2010 WL 5343202, at *9 (Tenn. Crim. App. Dec. 21, 2010), *perm. app. denied* (Tenn. May 26, 2011). As we have stated, the initial objection to the victim's presence is not included in the record that is before this court. The trial court stated, however, during the jury-out hearing that occurred after the objection, "At that time [of the objection] the State of Tennessee through [the prosecutor] indicated that the victim had a constitutional right to be here[.]" It was at this point that the defense moved for a mistrial. The record, including the transcript of the motion for a new trial, does not contain any indication that the State designated some other individual, such as a detective, to be its representative. The Defendant's motion for a new trial alleged that the victim, "a witness for the State not designated by the prosecutor," was allowed to remain in the courtroom in violation of Rule 615. At the hearing on the motion for a new trial, the defense argued that "no designation under the rule as to who was going to be excluded from the operation of the rule" had occurred at the trial and that the court "did not have the discretion to allow the victim to be excluded from the operation of the rule without the required designation." We conclude, based upon the record before us, that the State's argument at the jury-out hearing operated as a de facto designation of the victim as its representative under Rule 615.

In any event, a complaining party is not entitled to relief based upon any error in compliance with Rule 615 unless the party can establish prejudice from the witness's having heard earlier testimony causing the witness to change his testimony. *State v. James Michael Naive*, No. M2012-00893-CCA-R3-CD, 2013 WL 4505395, at *20 (Tenn. Crim. App. Aug. 21, 2013), *perm. app. denied* (Tenn. Dec. 11, 2013). We acknowledge that panels of this court have said that the proper practice is for the State to call its designated representative as its first witness. *See id.* at *19; *State v. Timothy Wright*, No. W2005-00525-CCA-R3-CD, 2005 WL 3533343, at *3 (Tenn. Crim. App. Dec. 27, 2005). This procedure is consistent with *Smartt v. State*, 80 S.W. 586 (Tenn. 1904), and *Mothershed v. State*, 578 S.W.2d 96 (Tenn. Crim. App. 1978), both of which predated the adoption of the Tennessee Rules of Evidence, and neither of which relied upon constitutional principles. Other panels of this court have rejected the premise that the State is compelled to call its designated representative first is still viable after the adoption of Rule 615. *See State v. David Roger Petty*, No. M2016-01036-CCA-R3-CD, 2017 WL 4457592, at *9 (Tenn. Crim. App. Oct. 5, 2017); *State v. Randall T. Beaty*, No.

M2014-00130-CCA-R3-CD, 2016 WL 3752968, at *15-20 (Tenn. Crim. App. July 8, 2016), *perm. app. granted* (Tenn. Oct. 19, 2016), *remanded for reconsideration on other grounds* (Tenn. Oct. 19, 2016), *aff'd as modified, remanded*, 2016 WL 6600148 (Tenn. Crim. App. Nov. 8, 2016), *perm. app. denied* (Tenn. Mar. 9, 2017). Given the necessity that a party establish prejudice from the non-sequestration of a witness, the question of whether a victim or other designated representative should be required to testify first in order to remain in the courtroom throughout the trial is necessarily a question of whether the defendant will be prejudiced in the absence of such procedure.[2]

In that regard, the Defendant has not identified any portion of the victim's testimony which he claims was tailored to conform with that given by State's previous witnesses or other evidence offered by the State. The Defendant relies entirely on his fundamental constitutional right theory, whereby prejudice is presumed and harmless error analysis is not conducted. At the motion for a new trial hearing, he argued that the victim was able to correct or clarify matters in his testimony in order to address the previous testimony and was able to testify that Ms. Lee, who testified before him, had given false testimony. Our review of the record leads us to conclude that the victim's testimony was at odds in many respects with that of the other eyewitnesses who testified for the State. The Defendant himself relies on these inconsistencies in his argument regarding the sufficiency of the evidence and the election of the offense in Count 1. The record does not support a conclusion that the Defendant was prejudiced by the victim's presence in the courtroom prior to testifying.

Because the Defendant has not established that the trial court abused its discretion with regard to Rule 615, we conclude, as well, that he has not shown that the court abused its discretion in denying the Defendant's motion for a mistrial premised upon a violation of Rule 615. *See Arnold*, 563 S.W.2d at 794.

Finally, we note that in considering the question of the victim's presence in the courtroom, the trial court ruled that the victim's rights provision of the state constitution "trumps" Rule 615. Because the question in this case turns on whether the Defendant has shown prejudice from an alleged violation of Rule 615, examination of the State constitutional provision related to victim's rights is unnecessary. *See State v. Elkins*, 83 S.W.3d 706, 713 (Tenn. 2002) ("We decline to address the State's assertion that Article I, Section 35 of the Tennessee Constitution supersedes the rule of sequestration as it relates to victims of crime. It is well-settled that courts generally do not decide constitutional issues if the case may be properly resolved on nonconstitutional grounds.").

---

[2] We note that Tennessee Rule of Evidence 611 grants the trial court the discretion to control the mode and order of the presentation of evidence and witnesses. The Defendant in the present case has not relied on Rule 611 in his argument that the trial court should have required the victim to testify first.

-22-

The Defendant is not entitled to relief on this basis.

## IV

## Admission of Evidence Pursuant to Rule 404(b)

The Defendant contends that the trial court erred in permitting the State to introduce evidence of an assault the Defendant committed against the victim sometime before the incident that gave rise to the present case. The State contends that the Defendant has waived consideration of the claim by failing to include the transcript of the hearing conducted on the issue in the appellate record and that, in any event, the court did not abuse its discretion. We conclude that the trial court did not err.

Tennessee Rule of Evidence 404(b) prohibits the admission of evidence related to other crimes, wrongs, or acts offered to show a character trait in order to establish that a defendant acted in conformity with the trait. Tenn. R. Evid. 404(b). Such evidence, though, "may . . . be admissible for other purposes," including, but not limited to, establishing identity, motive, common scheme or plan, intent, or absence of mistake. *Id*.; *see State v. McCary*, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003). Before a trial court determines the admissibility of such evidence,

> (1) The court upon request must hold a hearing outside the jury's presence;

> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b)(1)-(4). The standard of review is for an abuse of discretion, provided a trial court substantially complied with the procedural requirements. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997); *see State v. Electroplating, Inc.*, 990 S.W.2d 211 (Tenn. Crim. App. 1998).

At the beginning of the trial, the trial court stated that it had conducted a hearing regarding the admissibility of two alleged prior bad acts of the Defendant toward the victim: the one involving a golf club at the victim's place of employment and the other involving a stabbing with a screwdriver. The transcript of this hearing is not included in

the record that has been provided to this court. Although the failure to include a transcript of relevant matters generally results in waiver of the affected issue, the record in this case otherwise reflects the trial court's ruling. *See* T.R.A.P. 24(b); *State v. Bunch*, 646 S.W.2d 158, 160 (Tenn. 1983) (stating that the Defendant has the burden of preparing a fair, accurate, and complete account of what transpired in the trial court relative to the issues raised on appeal). Because the record contains other information about the hearing and the court's ruling, we will consider the issue on its merits.

At the beginning of the trial, the trial court stated that it had considered the requisite factors of Rule 404(b). With regard to the golf club incident, the court ruled that the evidence was admissible. It noted that the Defendant intended to rely on a self-defense theory, that the evidence would be offered to show the Defendant's intent and not his action in conformity with a character trait, and "that there was proof of that from [the victim] such that it was clear and convincing."

At the trial, the prosecutor asked the victim if the victim had "an earlier run-in" with the Defendant. Defense counsel objected and, at a bench conference, the following transpired:

> [PROSECUTOR]: I thought that was the ruling of the court.
>
> THE COURT: It was on the golf club incident.
>
> [DEFENSE COUNSEL]: I know, Your Honor, but I don't think it has really been raised. [The victim] has already said he was afraid because of the knife. That's all that's required.
>
> [PROSECUTOR]: I'll put on my case and he can put on his.
>
> THE COURT: I am going to allow that limited.

The victim then testified about the Defendant's coming to the victim's place of employment carrying a golf club and telling the victim to come across the street to talk.

The Defendant argues on appeal that the trial court admitted the evidence without finding that a material issue, other than conduct conforming with a character trait, existed, and without finding that the probative value of the evidence outweighed the danger of unfair prejudice. *See* Tenn. R. Evid. 404(b)(2), (4). We disagree. The record reflects that the court considered the Rule 404(b) factors and made appropriate findings to support its ruling that the evidence of the golf club incident was admissible. The Defendant makes no argument as to the lack of evidence to support any of the court's findings, other than a general argument that "the proof in this case was so confusing" that

the admission of the golf club incident evidence "had to substantially affect the jury's verdict." Upon review, we conclude that the trial court's findings are supported by the record. The court did not abuse its discretion in admitting the evidence, and the Defendant is not entitled to relief on this basis.

## V

### Cumulative Error

Finally, the Defendant contends that he is entitled to a new trial due to cumulative errors which occurred during his trial. The cumulative error doctrine requires relief when "multiple errors [are] committed in the trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76-77 (Tenn. 2010) (internal citations omitted); *see State v. Jordan*, 325 S.W.3d 1, 79 (Tenn. 2010) ("'[T]he combination of multiple errors may necessitate . . . reversal . . . even if individual errors do not require relief.'") (quoting *State v. Cribbs*, 967 S.W.2d 773, 789 (Tenn. 1998)).

Because we have rejected each of the Defendant's allegations of error, multiple errors upon which to predicate cumulative error relief do not exist. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE